No. 12,923.

·CUMBERLAND TELEPHONE AND TELEGRAPH COMPANY VS. MORGAN'S LOUISIANA AND TEXAS RAIL ROAD CO.

51 29
52 1858

SYLLABUS.

1. When a corporation undertakes to operate a railroad franchise it assumes all the duties and obligations which spring by law from the character of its business and from the customs incidental to it. It tenders a continuing offer to the general public that it will perform these duties for the benefit of each and every one of them when demanded at its hands. When any member of the public makes a demand upon it under such general offer there immediately results a civil obligation on the part of the company in favor of the party making the demand enforceable in the name of such party through the usual remedies by which contracts are enforced. The party seeking the enforcement of the obligation by *mandamus* can not be driven by the corporation to an action for damages, nor can it by the payment of money leave unperformed its specific affirmative legal duty.

2. When a common carrier refuses absolutely to recognize a certain duty which is claimed to rest upon it as such and to perform it under any terms and conditions, the party claiming the existence of such duty may test that fact by *mandamus*, leaving open the question as to the specific terms and conditions upon which it is to be performed.

3. The Court will not permit a railroad company to tie itself up in the discharge of its duties as a common carrier and in its affording to the general public all the facilities which it can consistently render, and is willing, able and anxious to render by a contract with another corporation that it should not do so.

4. · A contract made by a railroad company with a telegraph company to which the former had granted the exclusive right of way over and along its line that the railroad company would not, if it might lawfully refuse so to do, transport men or material for the construction, maintenance or operation of a line of poles and wires in competition ·with the line of the telegraph

30     SUPREME COURT OF LOUISIANA.

Cumberland T. & T. Co. vs. Morgan's L. & T. R. R. Co.

company except at and for the railroad's local rates, or furnish for any competing line any facilities or assistance it might lawfully withhold, or stop its trains or distribute any material therefor at any other than regular stations, if it could lawfully withhold doing so, is contrary to public policy and in restraint of trade.

O N appeal from the Civil District Court for the parish of Orleans. *King, J.,* acting for *Rightor, J.,* absent on leave.

———

*Dart & Kernan,* for Plaintiff, Appellee.

———

*Clegg & Quintero,* for Defendant, Appellant.

———

Argued and submitted December 6, 1898.
Opinion handed down January 9, 1899.

———

The opinion of the court was delivered by

NICHOLLS, C. J. The plaintiff applied in the District Court for a mandamus commanding the defendant to receive, transport and deliver poles, wires, cross-arms, etc., offered to be shipped by it on the line of the latter's railroad from Boutte station to Morgan City, Louisiana, and to deliver the same in the swamps along the line of the defendant, between the said *termini.* That the right of the railroad company to regulate the time, order and manner of delivery, so as not to conflict with its other business, be protected by said judgment, and its right to demand and receive from plaintiff the usual, just and proper freight charges for said service, be also reserved.

The application was based upon allegations, that plaintiff was actually building a telephone line from New Orleans to Morgan City, for the service of the public. That to erect said line it required poles, wires and cross-arms. That said line was being built along the line of the defendant's company, between Boutte station and Morgan City,

but on plaintiff's own right of way. That from Boutte station to Morgan City a large portion of the line was through inaccessible swamps, and it was customary with said railroad company to receive the said poles and other materials, and deliver the same in said swamps between stations where needed. That plaintiff had requested this service of the defendant, had offered to pay the just and proper charges of freights for so doing, and defendant had refused to receive and carry the freight

That said freight was to be shipped at New Orleans, and at Boutte station. That defendant was properly equipped for the carriage of the same, had done so for other corporations, and did not place its refusal upon the ground that it had stations to which to carry the same. That defendant's refusal to receive and carry said freight was arbitrary, and operated to suspend the building of plaintiff's line; that defendant was a public carrier, organized under the law of Louisiana, and domiciled in New Orleans; that it was bound by law and by its charter to render the services to all the public alike. That plaintiff was without a remedy except by *mandamus,* and said railroad company should be ordered, after hearing, to receive, carry and discharge the said poles, wires and cross-arms offered to it by plaintiff, from swamps along the line of its road from Boutte station to Morgan City.

The court ordered an alternative writ of *mandamus* to issue.

The defendant answered under benefit and reservation of a prior peremptory exception, that plaintiff's petition disclosed no right or cause of action. Defendant further excepted, that plaintiff prayed the enforcement of no duty which was defined by law, and sets forth no right which was granted by law and which was free from doubt. In its answer, defendant admitted its creation by act of the General Assembly of Louisiana, of the 8th of March, 1877.

It admitted that it owned a railroad, and a right of way between Boutte station and Morgan City, but it averred it did not operate the said railroad, and did not for its own account receive, transport, and deliver freight along said railway. That said railway and appurtenances were operated by the Southern Pacific Company, a corporation erected under the laws of Kentucky, the railroad and its appurtenances having been delivered to the last named corporation under a contract of lease, and respondent had not the right or power to make any contract respecting the receiving or transferring of freight upon

or along the said railway, but that such contracts, as well as the management of said railway, were undertaken by the Southern Pacific Company, and were within its powers. Respondent denied that a large portion of its line was through inaccessible swamps between Boutte station and Morgan City, and denied that it was customary for said railroad, or its lessee, to receive telegraph or telephone poles, or other material or any other freight, and to deliver the same in said swamp btween regular stations Respondent averred, that within the past twelve months, between the aforementioned stations of its line, there has been erected through the swamp characterized as inaccessible by plaintiff, a telegraph line requiring the use of poles, wires and cross-arms, and in all respects, similar to that which plaintiff is about to erect. That the Postal Telegraph Company had erected along defendant's right of way, through this same swamp, between Boutte station and Morgan City, and was then operating a telegraph line composed of material similar to and of the same character as the poles, wires and cross-arms used, and to be used by the plaintiff, and the same was erected without the extraordinary aid of respondent, such as is demanded by plaintiff, and respondent did not receive said poles or other material of the Postal Telegraph Company, and deliver the same in the swamp between the aforesaid stations.

Respondent denied that it had done for other corporations or for any corporation what was demanded of it by the plaintiff. Respondent denied that its refusal to receive and carry the said freight as described in plaintiff's petition was arbitrary, or that such refusal operated practically to suspend the building of plaintiff's line. Respondent averred that between Boutte station and Morgan City, in the so-called inaccessible swamp, there were on defendant's line fifteen sidings or side tracks and stations the longest distance between these stations and sidings being less than six and one-half miles, and the shortest being less than one and one-half miles. The distance between Boutte station and Morgan City being fifty-six and one-half miles, there was one siding then to every three 63-100 miles.

Respondent averred, that there were operated upon its line on each and every twenty-four hours, fourteen regular schedule trains, (four of which carried the United States mail), passing to and fro between Morgan City and Boutte station. That between these named stations there was a large number of irregular trains necessary for the proper conduct of the business, and for the trans-continental traffic which

FIFTY-FIRST ANNUAL REPORTS, 1899.          33.

Cumberland T. & T. Co. vs. Morgan's L. & T. R. R. Co.

passed along respondent's line, which number varied, but was rarely
less than eighteen trains, and that during the month of September,
of the year 1896, the number of trains passing along the line between
Boutte station and Morgan City averaged eighteen trains for the·
month of September, and twenty-two and eight-tenths for the month.
of October, each twenty-four hours, and there was reason to believe,.
and respondent believed that it would be necessary to operate so large
a number of trains during the months of September and October, in
the year 1898; and that thereafter, during the months of November
and December, of the year 1898, it would be necessary to operate a·
large number.   And that to undertake, receive, transport and deliver
the poles, wires and cross-arms, and other material of defendant in the
swamps, between stations, would require the equipment and operation
of a special train, and special force of men, and would require the
modification of schedules, and of existing arrangements for the opera-
tions of trains, and the other business along the whole line of defend-
ant's railway.

That, in the face of these conditions, it was unusual and extraordin-
ary for plaintiff to demand that the material for its proposed line
should be delivered between regular stations, and that there were no·
usual or proper charges for such services fixed by law, by custom, or by
contract.   That it was under no legal duty or obligation to receive
and deliver in swamps, along the line of its railway between the
stations aforesaid, except at regular stations, any of the material of
the plaintiff, and, that if it should undertake to do so, or agree to do it,.
such undertaking would be a matter of contract, the terms and condi-
tions of such contract must be fixed with reference to the situation,.
all the circumstances of which in this, or any like judicial proceeding,.
could not be brought to the knowledge of the court, and it was, there-
fore, beyond the power of the court to coerce respondent into the
making of the contract with the plaintiff, and to compel respondent
by *mandamus* to perform a service, the conditions of which could not
be known to the court, or be expressed in its writ.   Respondent
averred, that it had never delivered along the line of its railway
between stations, any poles, wires, or cross-arms for the construction
of telephone or telegraph lines, nor had the same been delivered by its
lessee, except for its own use and needs, and in the performance of its·
contract obligations with the Western Union Telegraph Company, by

which contract, the Southern Pacific Company, in order to erect, for the use of the system of railways, of which respondent's railway was a part, and in order to obtain the use of telegraph lines elsewhere, all necessary for the proper conduct of its own business, undertook to receive and to erect poles, and to receive and to string wires, and generally, to erect, repair and maintain a telegraph line along the line of respondent's railway, without which telegraph line and the use of other telegraph lines, acquired by the erection of its own, respondent's and the Southern Pacific Company would be wholly unable to perform their duty as common carriers, and that by the stipulations of the contract aforesaid, for the erection, repair, maintenance of its own lines of telegraph, the Southern Pacific lessees, as aforesaid, bound itself, (and respondent was thereby bound) to keep as to poles, wires, cross-arms and the like, the general rule of railways as common carriers, namely: to receive and deliver freight only at regular stations, and the Southern Pacific Company specially bound itself not to distribute material for telegraph and telephone lines at other than regular stations, which contract and stipulation it was lawful for the Southern Pacific to make, and which contract could not be set aside, and ought not to be abrogated by a writ of *mandamus* at the suit of plaintiff.

Defendant annexed to its answer, the contract between itself and the Western Union Telegraph Company. The District Court rendered judgment, perpetuating the alternative writ of *mandamus,* and ordering a writ of *mandamus* to issue, commanding the Morgan's Louisiana and Texas Railroad Company to receive from the plaintiff, and to transport and deliver the poles, wires, cross-arms and materials offered to be shipped by the plaintiff for the purpose of building its telephone line along the line of said railway, from Boutte station to Morgan City, in the State of Louisiana, and to deliver the same in the swamps along the line of the said railway company between the said *termini* at points to be designated by the shipper

The court, in its decree, recognized the power and right of the defendant company to regulate the time, order and means of delivery, so as not to conflict or interfere with its regular business and passenger traffic, and to receive from the plaintiff the usual just and proper freight for the said service. It reserved the rights of the parties on this subject, declaring the same protected by the decree.

Defendant appealed.

The contract referred to in the pleadings between the Southern

FIFTY-FIRST ANNUAL REPORTS, 1899.     35.

Cumberland T. & T. Co. vs. Morgan's L. & T. R. R. Co.

Pacific Railway Company and the Western Union Telegraph Company, was entered into on the 3rd of January, 1887.

It began with the recital, that the Southern Pacific Company leased and operated certain railroads and property of other railroads, which were described, among them the defendant company—that the Western Union Telegraph Company had certain contracts with these companies, and it was desirable, and to the interest of all parties to supercede by a new agreement, all contracts then in existence, whereupon, it was substantially agreed, that the Telegraph Company should purchase all lines of poles then owned by the Southern Pacific Company, or by any of its branches, with all the instruments, etc.

The outstanding accounts between the parties were adjusted, and provision was made that thereafter, the telegraph company should furnish all the necessary material to construct and re-construct the line of wires between New Orleans and El Paso on its part, and that of the roads it leased or operated. The railroad company agreed to transport, free of charge, over the railroad covered by the agreement upon application of the superintendent or other officer of the telegraph company, all persons in the employ of that company when traveling on business of the same, and also, to transport and deliver free of charge along the line of said railroads, all poles and other material and supplies for the construction, operation. maintenance, repairs and renewal and reconstruction of the lines and wires covered by the agreement, and of such additional wires and lines of poles and wires as might be constructed under the provisions of the agreement, and all material and supplies for the establishment, maintenance and operation of the offices of both parties to the agreement, at places along and adjacent to said railroad, it being understood, that all poles and other material and supplies for use of any said railroads should be transported free over any and all of the railroads covered by the agreement. The railroad company agreed to furnish all the labor to set the poles in the ground, and to erect the first wire and the insulators thereof, and thereafter, to maintain and keep in order and repair the telegraph company's poles and wires, as well as those which might thereafter be erected. The parties agreed that a wire should be set apart for the use of the railroad company, and the remainder of the wires without limit, should be used by the telegraph company for its general business. The contract provided for the free transmission of messages, relating to the railroad and steamship business, to any

.amount not exceeding $20,000, for the mileage then existing, of 1700 miles of railroad, and six dollars *per annum* for each additional mile leased or occupied afterwards, and for anything in excess of $20,000, .the railroad company should pay the telegraph company half rates

The telegraph company agreed to furnish the operators and the railroad the offices needed.

The Sixth article of the contract was as follows:

*Sixth*—"The Southern Pacific Company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the ex- ·clusive right of way on, along, and under the line, lands and bridges .of the railroads, covered by this agreement, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, and underground or other lines for com- mercial or public uses or business, with the right to put up or con- :struct, or cause to be put up, or constructed, at the telegraph com- pany's own proper cost or expense, from time to time, such additional wires and such additional lines of poles, and wires, and underground, or other lines, as the telegraph company may require; the lines to be located on the railroad right of way, such distance from the tracks, and in such manner on bridges, as the Southern Pacific Company may ·designate; and the Southern Pacific Company agrees to clear and keep clear said right of way of all trees, undergrowth, and other obstruc- ·tions to the construction and maintenance of the line and wires, pro- vided for herein, and the Southern Pacific Company will not, if it may lawfully refuse to do so, transport men or material for the construc- tion, maintenance or operation of a line of poles and wire, or wires, ·or underground or other lines in competition with the lines of the telegraph company, party hereto, except at, and for the Southern Pacific Company's local rates, nor will it furnish for any competing lines, any facilities or assistance, that it may lawfully withhold, nor if it may lawfully decline to do so, stop its trains, nor distribute any material therefor at other than regular stations.

"*Provided, Always,* That in protecting and defending the exclusive ·grants conveyed by this contract, the telegraph company may use any proceeding in the name of the Southern Pacific Company or of any ·other companies, for which it is acting hereunder, but shall indemnify and save it and them harmless from any and all damages, .costs, ·charges and legal expenses incurred therein or thereby."

Prior to the bringing of the present suit, a correspondence took

place between A. W. Crandell, general superintendent of the plaintiff company, and A. C. Hutchinson, president of the defendant company, in reference to the subject matter which is involved in this litigation.

Under date of June 6th, Crandell telegraphed to Mr. Hutchinson, then in New York, to inform him of his conclusion in reference to the distribution of telephone poles. He said that his company did no telegraph business, that the Illinois Central, after first refusing on account of contract with Western Union, finally recognized that the proposed distribution did not conflict therewith. He asked him to arrange matters while in New York. Mr. Hutchinson telegraphed back, he would await the return of his attorney who was absent, before reaching a decision. On the 20th of June, he telegraphed Mr. Crandell, "he could not arrange as requested, too many complications likely to arise."

On the 23rd of June, Mr. Crandell wrote to Mr. Hutchinson, the following letter:

"Dear Sir—As you are aware from my conversation with you, this company is building a telephone line along the route of Morgan's Louisiana and Texas Railroad, but not on its right of way, between New Orleans and Texas, and cannot build that portion of the line between Boutte station and Morgan City, unless the railroad company will render this company the same service it renders the telegraph company.

"We understand you refuse to do this because your contract with the Western Union Telegraph Company prohibits it, and are confirmed in that belief by your telegram of the 20th instant, as follows: 'Cannot arrange as you request. Too many complications likely to arise.'

"Fully impressed with the desire to live on good terms, and fully appreciating that public corporations should not quarrel, and seek the courts if it can be avoided, we have submitted to the refusal, and incurred the extra expense of wagon distribution, wherever we could distribute by wagon. We are now, however, confronted with the situation that we cannot distribute in the swamps between Boutte station and Morgan City, unless your railroad company will extend the customary facilities; we must, therefore, either abandon the line, or insist upon the performance of this duty.

"It is with deep regret therefore, that we announce to you that we must insist upon an early distribution of poles, and if your company

persists in its refusal, will be compelled to lay the matter of this unjust discrimination before the United States District Attorney, as. we are advised that your refusal is a direct violation of the Inter-State commerce law. We will also proceed by *mandamus.* We beg to assure you, that we have, as yet, made no complaint, and will make none, until the lapse of a reasonable time will allow you to answer."

To this letter, the following reply was received from Mr. Hutchinson:

"Dear Sir—I have your letter of the 23rd inst., and in reply thereto, I have to say that we shall be very glad to distribute your poles upon the line of the Morgan Road, and if we are at liberty to do so without violating the obligations imposed upon us by contracts made with the Western Union Telegraph Company, bearing date, the 3rd day of January, 1887, under which we agreed, among other things, that we would not furnish for any competing line any facilities or assistance, that we might lawfully withhold, nor if we might lawfully so to do stop our trains, nor distribute material therefor at other than regular stations.

"I need not say that we should like to do this business for you and earn the compensation to be earned by doing it; that we are acting against our own immediate pecuniary interests in declining to do it, but, we have made a contract with the Western Union Telegraph Company and we wish fairly and honorably to fulfill the obligations which we have assumed therewith. We do not wish to extend those obligations one whit beyond their fair and reasonable meaning, but, on the other hand, we do not wish to avoid any obligations which we have fairly assumed. If the court should hold, that, nothwithstanding this contract with the Western Union Telegraph Company, we are bound to distribute your poles upon receiving reasonable compensation therefor, we shall certainly be glad to earn the compensation to which we should be entitled for rendering the service, but we ought perhaps to correct an error in your letter in which you say that you cannot distribute your materials in the swamps between Boutte station and Morgan City, unless the railroad company will extend some facilities to you in connection therewith. This must be a mistake on your part, as the Postal Telegraph Company has recently constructed a line between these points without our extending to them any facilities in connection therewith, and I know of no reason why you cannot do what the Postal Telegraph Company has done in that respect. At the

same time, if it were in our power to do so, without disregarding obligations to our agreements with others, we should be glad to facilitate your distribution of material upon receiving reasonable compensation therefor, as you can very well understand."

On the 15th of July, 1898, replying to a letter of Mr. Crandell, which is not in the transcript, he wrote to him as follows:

"New York, 21st July, 1898.

"Dear Sir—I have received your favor of fifteenth, suggesting that you hope before the matter of distribution of poles is submitted to the courts, I might reconsider my decision on the subject. I am perfectly willing to reconsider the matter, but I don't see how I can change the views in reference to it, which were expressed in my letter to you of the 27th ult. We should be very glad to do the business of distributing the poles at reasonable prices therefor, if we were at liberty to do so without violation of our contract with the Western Union Telegraph Company, which I referred to."

## Opinion.

The question which meets us at the threshhold is, whether the plaintiff is authorized to institute this action.

When a corporation undertakes to operate a railroad franchise, it assumes all the duties and obligations which spring by law from the character of its business, and from the customs incidental to it. It tenders a continuing offer to the general public, that it will perform these duties for the benefit of each and every one of them, when demanded at their hands.

When any member of the public makes a demand upon it under the general offer, there immediately results a civil obligation on the part of the company, in favor of the parties making the demand enforceable, through the usual legal remedies by which contracts are enforced; were it not so, there would be a right without a remedy, for it could not be pretended that the State officers could be called upon to bring actions in the name of the State, for the enforcement of the performance of duty by the company to all the private individuals with whom they have business relations.

It is said that these various parties have an action for damages

against the company for non-performance of duty, and that that is their remedy, and that they cannot proceed by *mandamus* to force the specific performance of the duty itself.

There is nothing in this claim.

The party owing the duty cannot drive the other party to an action for damages, and by payment of money, resist the performance of duty. What the plaintiff in this suit asks for and is entitled to, is the transportation of his freight, and not the payment of money to him. The latter would furnish no adequate remedy.

It is said that the *mandamus* cannot be granted, because the court would be called upon to make itself a contract between the parties, and this it is not authorized to do.

The court is not called upon to make a contract between the parties, but to order the performance by the company of the duties as a carrier, which it refuses absolutely to recognize as incumbent upon it, under any terms or conditions.

The company is left free to charge for its services upon a *quantum meruit*.

While we have taken up these questions and disposed of them, it is very evident from the correspondence between the presidents of the two companies; from the pleadings in the answer, and from the stipulations in the contract annexed to the answer, that the service which the plaintiff demands at the hands of the defendant, is one which the latter is able, willing and anxious to perform, and that the only reason which stands in the way of its performance, is the contract which it has made with the Western Union Telegraph Company.

We think it quite evident, that the defense set up in this case, though made in the name of the Morgan's Louisiana and Texas Railroad Company, is one in reality made in that name by the Western Union Telegraph Company, under the stipulations in the contract made between it and Morgan's Railroad Company, and the real question is, whether the court will permit a railroad company to tie itself up in the discharge of its duties as a public carrier, by a contract such as that shown by the record.

We think such a contract against public policy, in restraint of trade, and that it should not be permitted to stand in the way of the company's affording to the general public all the facilities it can consistently render, and is willing and able to render.

We think such a contract should be brushed aside.

(Baltimore and Ohio Telegraph Company vs. Western Union Telegraph Company, 24th Feredal Reporter, 319).

For the reasons assigned, it is hereby ordered, adjudged and decreed, that the judgment appealed from be and the same is hereby affirmed.